That brings us to our third case of the day. And that case is Moore v. Intuitive Surgical Inc. And we will hear from Attorney Sprague first. Your Honor, thank you, Erin Sprague for the appellant. In this case, we have experts for the plaintiff and the defense that share almost indistinguishable credentials and qualifications with one exception. The defense expert used the medical instrument at issue on people and believes it to be safe. By applying a too rigid standard for evaluating qualifications, the effect of the district's court ruling was that only users of a medical instrument may testify as experts in an action alleging that the instrument they use is defective. And of course- A couple of minutes ago, I have a question. My understanding also is that this particular doctor, Dr. Hall, was also admitted as an expert in another case regarding the same device. That is correct, Your Honor, and that's in the hearing transcript. And that goes to the policy point that I'm making. Of course no expert is going to testify against a product that he routinely uses in surgery because that's against their self-interest. So there is a very limited pool of experts available to testify in these types of cases. And the fact that the appellee in this case is going so hard on Dr. Hall is because it's their chance to take out one of these experts. And it's also in service to the client. I mean, let's don't go to the grand conspiracy if it's not necessary. True enough, Judge Carnes, but- If this is in their client, you'd be doing the same thing with them. Absolutely, and you know, they have an obligation to zealously represent- Let me ask you one thing, it's an overriding concern. I have a number of cases and this is a prototypical example. Why is Dr. Hall's report sealed? Your Honor, I believe it is sealed because it contains the medical information of Ms. Moore. Well, it ought to be redacted instead of sealed. I mean, what are we to- Does the sealing order tell us that we ought not publicly discuss various aspects of it? I mean, it's got Mrs. Moore's name on the case, so everybody knows. It puts court in a difficult situation here. What are we supposed to not talk about publicly? What are we supposed to not put in the opinion? I don't really understand that. Your Honor, to be frank with the court, that's not an issue that I know a lot about from the record. I know that each district court and indeed each appellate court typically has administrative rules that require certain things to be sealed. Well, unless you tell the court to the contrary within a week or so, if I write separately or jointly on the court, in this case, or I'm responding to somebody who has, I'm going to treat that record as one that's not sealed to the court and is not sealed publicly if the court wishes to discuss it in an opinion. Your Honor, I think that's a perfectly reasonable way to approach the issue. And as long as I'm speaking directly to you, Judge Carnes, I think that in a case that you were on, the Adams case, this policy issue that I was discussing previously about there being an uneven playing field due to defendants' actions, that type of concerns plays into this case as well. Just like in Adams, the playing field being uneven because the trade organization was writing rules for expert qualification and litigation against it. In this case, if we artificially limit the pool of experts to only friendly experts who use the product, then we've created an uneven playing field. And it's that exact concern that was cautioned against by the Sixth Circuit in the Menino case, which we cited in our brief as follows. If we were to declare as a rule of law that one must actually have practical experience in a given industry in order to qualify as an expert in litigation involving its products, we might very well place an onerous burden on plaintiffs in some cases where the industry is small. Yeah. Counsel? I mean, isn't it possible that he would have had experience with some other kind of robotic machine other than the Da Vinci? I mean, here he had no experience with any robotic surgery, isn't that right? Your Honor, I, first of all, as a factual matter, I think that the record reflects that he did have at least some experience with the Da Vinci machine. Wasn't he trained by some of the, by Da Vinci in the use of the robotic machine? You broke up a little bit there. I believe your question was, wasn't he trained by Da Vinci in the use of the robot? I mean, did, there was, putting aside the few hours that he had when his hospital received the Da Vinci machine, right? I guess my question is, did he ever conduct any kind of surgery, an actual surgery, not just playing around with machines, robotically? Your Honor, the answer to that question is, Dr. Hall has not operated on a person using the Da Vinci robotic machine. And it is our position that that doesn't disqualify him as an expert. And I, right, I'm sorry. I understand that, but my question is whether he ever used any kind of robotic, whether he ever used a robot during surgery. It didn't have to be the Da Vinci robot, but did he ever use any kind of robot device during surgery? Your Honor, that question wasn't specifically asked of Dr. Hall. I don't believe there's any evidence in the record that he does anything other than straight up laparoscopic procedures. Counsel, may I ask you a question? Didn't Dr. Hu, and I don't know if I'm pronouncing his name correctly, who was the expert for the defendant, didn't he actually testify in his deposition that there was no difference between robotic surgery and laparoscopic surgery, and regular surgery with regards to performing a hysterectomy? Your Honor, that is correct. And in fact, we laid that out very clearly in our papers. Counsel, I thought what he said was the procedure, that is the process of the order of the things that you do and the types of things you do are the same. But, that because of the rotational head of the Da Vinci, there's a difference in how it actually is executed because the shaft in the Da Vinci does not have to rest on parts, I guess, within the body in the same way that it would if you did not have that kind of 360 degree rotational aspect to the tip. Isn't that what he said? Your Honor, I believe that there's a difference between his deposition testimony and his testimony at the Daubert hearing. In his deposition testimony, I believe he was much more clear about there being really no difference between the laparoscopic procedure and the robotic procedure. There was a discussion by both experts. Two minutes remaining. About the wrist action in the robotic procedure. However, Dr. Hall was able to describe that. He was aware of it and he knew how it worked. And, I would remind the Court that under Rule 702, it is not simply experience that qualifies an expert under the Daubert standard. Knowledge is also a means of qualification. And certainly, Dr. Hall demonstrated his knowledge of that wrist action in his testimony and gained that knowledge through his training on the da Vinci robot and his review of the da Vinci literature. So, under the standard that we've espoused in our papers, certainly he was qualified to render expert opinions about hysterectomies using a robotic approach. When this Court approaches the analysis, like Judge Rosenbaum suggested in the case of J.G. versus Carnival and looks at his credentials, what we find is that we have a man who has a board certification in obstetrics and gynecology is a 40-year gynecological surgeon who's performed 4,000 to 5,000 hysterectomies, has sat on peer review committees regarding... And he also was trained in how not to burn ureters. Correct, Your Honor. Which is the injury in question here. Which is the injury in question. So, what you, Judge Rosenbaum, ruled in the J.G. case is that an expert doesn't have to have experience in the precise manner or matter at issue in order to be qualified as an expert. And so, even if it were true that... The expert here, he's being offered as an expert in causation, correct? That is correct. And so, when you look at whether this surgery has caused the injury in question, certainly his credentials match up and he's qualified under the standard in 702. The fact that he has limited experience or gaps, even if he had limited experience or gaps in his knowledge regarding the robotic procedure, that would go to his credibility, which would be a matter for cross-examination in front of the jury. Counsel, let me ask you this. Was it settled or disputed as to the possible causes of the burns? In other words, did the parties agree, experts agree? Did it pretty much get down to either Dr. Efemini caused it through carelessness or actions or conduct of him or the scissors caused it? Was that what it boiled down to? Your Honor, I don't think I can give you an answer that is as clear cut as maybe you would hope. Both experts undertook a analysis, which is basically differential diagnosis and considered a whole host of possible reasons. And they arrived at different conclusions. Basically, Dr. Hall, after ruling out other issues, concluded that it was arcing from the MCS of the robotic instrument. Dr. Huh, I don't believe gave an opinion as to what it definitely was, but suggested it might be a surge in air or thermal spread. And really that's as precise as I can give you, Judge Carson. What is thermal spread? Thermal spread, I think, is a more or less natural heat transfer that can occur in the procedure regardless of a defect of the instrument. But is it also, it can occur in the procedure under his testimony, regardless of the performance of the surgeon? I think you're asking me, can thermal spread occur regardless of the performance of the surgeon? And I'm not sure the record is clear on that, Your Honor. Here's why I ask, and here's why I see your most viable theory for persuading me. If there were three possible, let's put it this way. If there were two possible causes of the burns, one is Dr. Efemini, and the other is the defect in the instrument. And Dr. Hall said, as he does in opinion one and five, that Dr. Efemini did nothing wrong. He didn't cause it. Then that is admissible expert testimony on the fact that Dr. Efemini didn't cause it. And therefore, logically, it had to be caused by the instrument. And I think it's undisputed that the instruments sometimes aren't. But now, if there are four other possible causes, and Dr. Hall's testimony doesn't rule out the other two or three, then that doesn't work. Then, Your Honor, I think, I'm sorry, I have to interrupt you today. No, go ahead. Your Honor, I think then we are where we need to be. Only the possible universe of causes that Dr. Hall started with wasn't two. It was something more than two. But he went through the literature, and he ruled out all of the other possible causes. Surgeon error, endometriosis, comorbidities, and a number of other things, and arrived at the conclusion based on that differential diagnosis and the undisputed fact that the machine arcs, that it was the MCS. But let me ask you this question on the theory that I'm suggesting and that I understand you to be supporting, which is that even without expertise in this particular type of scissors, given the admission that the scissors sometimes arcs, if he rules out everything else but the arcing of the scissors then that's viable expert testimony. But where do we look for what his proffered testimony is? If I look at the expert report of Dr. Hall's, that's not in there. He only rules out effeminate, and then he proffers that it was caused by the, or he suggests or has an opinion that it was caused by the scissors, but he doesn't rule out the other possibilities. So can you tell me that he did that in his Daubert testimony? He did, Your Honor, and that's at record 129. And I can provide at least a range of, a range of pages for you and would like. If you would provide those after the argument, it's okay with Judge Rosenbaum. I would appreciate that, but. That's fine. Yeah, and I take it, counsel, too, that your position is that on this issue, you're not bound to look no further than, we're not bound to look no further than the report that we can look to the hearing because the district court did? Yes, Your Honor, and that's exactly right. I mean, both sides submitted extensive evidence regarding these Daubert issues. An evidentiary hearing was held, and all of that information was taken under consideration by the district court. Okay, all right, that's very helpful. I appreciate it. I believe my time has expired. If not, I can keep going. I think we've got your case, counsel, and we will hear from you on rebuttal. If you'd like, you have five minutes reserved. Thank you. All right, that brings us to Mr. Wyatt. Thank you, Your Honor. May it please the court, Jeff Wyatt on behalf of Intuitive Surgical. I'd like to, yes. Would you address my theory of why this testimony may be admissible as far as it went, and why it may also be relevant and material on the cause and may be sufficient on the cause if it's credited? Sure, so yes, Your Honor, and just sort of taking a step back, the method that Judge, sorry, that Dr. Hall used for making a causation analysis was called a differential diagnosis where you rule in possible causes and then rule out the less likely causes until you arrive at the most likely cause. And in order to even start that process, you'd have to have some basis for concluding that the instrument itself could have caused the injury here, and I think that is somewhat tied up with whether he's qualified to address that issue. I understand Your Honor noted that there was some agreement that the instrument can arc, at least theoretically, but that's not, you know, there still has to be an evaluation of the relative probabilities as part of a differential diagnosis. So number one, I don't think he can get even to that point. But number two, I don't think, and we argue in our brief, that Dr. Hall did reliably rule out the other possible causes of injury, which did include thermal spread, which is a situation where heat traveled from the target organ to adjacent tissue. It didn't rule out the possibility that there was a hot instrument that touched tissue inadvertently during the surgery. It didn't really address in any meaningful way the patient. Counsel, may I ask you a question? Yeah. Because we're talking really about qualifications. We're not talking about reliability here. So Dr. Hall performed 4,000 hysterectomies. He used the da Vinci system on a mannequin. He reviewed the medical literature regarding the system. He works in the hospital that has a da Vinci. I guess, you know, if we had to write an opinion here, what more would have been required in order for him to be qualified to be able to be an expert on causation after the injury during the hysterectomy? I appreciate that question, Your Honor, because he does have a background, and there are cases that talk about, you know, not needing to be the best expert or not having to be the most specialized doctor available. But the issue here is what kind of expertise does it take to be qualified to testify, from your knowledge or experience, what the position of the shaft would be? Because that's really the question here, is the allegation is... Yes, Your Honor. Why doesn't his lack of experience with the da Vinci just go to his credibility? In other words, why don't we just leave that to the jury? And why isn't there enough here to get him through the gateway determination? Sure, Your Honor, and I'm building to that, but the answer is he just doesn't know. I mean, he doesn't have the knowledge from his experience to answer the question. And I think in the carnival case... But then it makes it seem like the only person that could ever be qualified... And so you didn't answer my question. The only person that, if I had to write this opinion, the only person that could be qualified would be someone who actually used the same piece of equipment in performing this surgery. So the fact that he performed 4,000 other hysterectomies would not make him qualified. I don't think that there is a categorical rule coming out of the district court's decision or our argument that you would have to have used the system before you could have observed the system. Because the issue is really, how do you know where the instruments would be? And I think if you look at the hearing of Document 129, it really illustrates the stark difference in knowledge between Dr. Hall, who was speaking from his experience about where straight stick instruments, the traditional laparoscopic instruments that he uses, would be, and Dr. Ha, who explained that because of this wristed ability of the robotic surgery system, the instruments aren't gonna be in the same place. So the very foundation of Dr. Hall's testimony was really an erroneous assumption about the orientation of the instruments during surgery. And this is sort of a weird case where his experience, actually, his substantial experience, blinded him to the reality that would exist here. Now, conceivably, Dr. Hall or somebody else could gain the experience even without using the robot as long as they observed the surgeries with this purpose in mind, with developing the knowledge to know where the placement of the instruments would be, but he didn't do that. Can you address, because I think your time is limited, can you address the reliance of the district court on the Lebron case that dealt with a clinical psychologist that was excluded from testifying about statistics? Isn't that fundamentally different where the person was testifying about something that they had no knowledge on? They were talking really with statistics as opposed to clinical psychology. Isn't that different than what happened here? Well, so at some level, every Daubert case is different, but I mean, in terms of the argument we're making, I do think it's supportive. This is an expert in Lebron whose specialty was drug use and drug-related disorders and had studied that literature, had written and published in that area, but he had not done the specific thing that he was trying to do, which was to testify about the relative rates of drug use within a particular subpopulation relative to the general population. And I don't think you can say that Lebron, which is what plaintiffs argue, is all about one field versus another field in Lebron, whereas here it's a field versus a subfield. I think that's very formalistic. I think what you have to look at is, does this expert actually have the training he or she needs to answer the question at issue in the case? And that is really what the case is key in on. If you take the JG case that plaintiff cited- Isn't Lebron about really having an expert testify in a field of science that they have literally no training in? And I mean, you can't really honestly say that about Dr. Hall, can you? Well, I'm not sure that that follows from Lebron. I mean, if you're in an academic field, I think you probably encounter drugs, especially if you're studying drugs. You would encounter literature that shows use rates in populations just as sort of your normal practice. But to take another example that I think is closer to what you're talking about, in United States versus Brown, the defense expert there was excluded for lack of sufficient knowledge on whether a particular substance was a chemical analog to a controlled substance. He needed to have a background in chemistry, which he had. But what the court said was it wasn't specific enough to the question at issue in the case because he'd only worked with the substance that was at issue in the case in isolated projects. And I think that, again, that case is focusing on, do you have the background that you need to answer the question at issue in this case? And again, I think the JG case, which plaintiff cited a minute ago, does the same thing. The issue there was whether the security expert should be excluded because he had never looked at security on cruise ships specifically. And what Judge Rosenbaum said was that the plaintiff had not shown that cruise ship security is so vastly unrelated to security in other areas and surrender black expertise inapplicable and negate his qualifications. But that was shown here. That was shown at the hearing. Dr. Hall's experience doing traditional laparoscopic surgery was vastly unrelated to the very precise question he was trying to answer. And the only part of his opinion that was excluded, I mean, he was not fully excluded with respect to the other experience he had, which might relate to other questions in the case. The question was, where would that robotical surgery, surgical instrument be during the surgery? And the hearing showed that he didn't know the answer to that question. His experience just didn't give him the basis to opine on that issue. And so that's really what this case is about. And I think plaintiff is trying to cast this in stark terms. This is, we're seeking some sort of win for the industry or we're trying to impose a rule where somebody would have to be a robotic surgeon. And that's really not the case. It's a ruling that grows out of the facts in the case, elicited at a hearing where Dr. Hall was given the opportunity to explain why he knew that a shaft would be in a certain place during the surgery. And he was unable to do so. I mean, he asserted he would know it in a couple of places, but it was pure if he dicks it. And notwithstanding the fact that these issues were drawn out during the cross-examination of Dr. Hall at the hearing, there was no attempt to rehabilitate him. Nobody came up and said, well, tell us a little bit more about why you know, based on your experience doing this one form of surgery, that the arm of the robot will be in a particular place. Do you say it? That question wasn't asked and he just never, he never answered it. And I think if you look at the testimony of Dr. Hall, he really breaks it down. He says, you know, there's this issue of court placement. Where do we make the incisions on the body to have the instrument enter the body? And that's different between the two surgical modalities because of this wristed action on the robotic surgical instrument. And as a result, the shafts don't have to be in the same place. When you're doing a traditional surgery, you sort of have to put the shafts of the instrument in a particular place because you can only manipulate them from outside the body with the human wrist. But when they can move around inside the body, the court placement can be different. And so the whole setup of the surgery is just different from what Dr. Hall does in his normal practice. And it was very clear from the hearing that he did not appreciate that. He was asked a question about the court placement and he acknowledged, you know, it's different from what I see in my practice. But to him, it was an issue of personal preference of the surgeon. He said, you know, everybody does them different. But that's just not right. As our expert explained, the court placement is actually driven in part by the nature of the tools at issue. And because those tools are different and because they have different capabilities, the shaft of the instrument wasn't gonna be where Dr. Hall thought it was gonna be. It was gonna be entirely away from the site of the injury. In fact, as Dr. Ha described at the hearing, the setup was such that the instruments came in through the body on the side opposite from where the injury occurred. And they would largely be working in spaces away from where the injury occurred because of the nature of the setup, because of the orientation of the instruments and the wristed action and the port placement. And so those are all things that Dr. Hall just didn't address at any point, not in his report, not in his death deposition, and not at the hearing despite the opportunity to do so. And so I do think that the district court's decision here is amply supported by the record that was created. This is one of those cases where somebody who's very experienced just doesn't have the particular experience that that person needs to address the question that's at issue in the case. And I think one case that really crystallizes this principle that we cite in our brief from the Third Circuit in Calhoun versus Yamaha Motors is more specific knowledge is required to support more specific opinions. And again, this is a principle that will apply in different ways in different cases, but I think it does illustrate what's going on here, which is that you have an expert who is qualified to address a number of things in this area, but it's just not that critical question presented here of where is that shaft gonna be? Is it gonna be close enough to the ureter to cause injury? And so I think that's really the basis of the district court's opinion. I noticed counsel didn't really get to the issue of whether the verbiage about exacting scrutiny is correct, which is the focus of the brief, and I'm happy to address that. But I really think that if you examine the district court's opinion and the record that underlies it, it's not an issue of whether the standard was too high or too exacting per se. The district court did what courts do in these cases and just looked at whether there was a match between the opinion that the expert sought to offer and the expertise that that witness actually had and concluded that one wasn't sufficient to support the other, and that is 100% correct. It's certainly a decision that this court should defer to under the abuse of discretion standard, which Judge Carnes in United States versus Brown described as equivalent to putting a thumb and two fingers on the scale on the side of the district court's opinion. So I believe I'll stop there and ask if the court has any other questions, and if not, I will seize the time. All right, thank you, Counselor. We will, I'm sorry, did somebody have a question? No, thank you. Then in that case, we will hear again from Mr. Sprague. Your Honor, I want to begin by just providing the information I promised to Judge Carnes. The information that you're seeking, Judge Carnes, is at record 129 pages 33, at least through 41, and since it was brought up by Appley's counsel, Dr. Hall did address obesity. That's on pages 38 and 39. He did address thermal spread. That's on pages 40 and 41, and he did do a thorough differential diagnosis. What we just heard from Appley's counsel in his argument to this court on qualifications was really a closing argument to a jury on the issue of causation. It didn't go necessarily to Dr. Hall's qualifications. Let me deal first with the fact issues about the difference between port placement, wrist action, straight stick laparoscopy, the relationships of the instruments to the anatomy. That is addressed both in our papers and in the transcript of the hearing, which I just cited to the court. We showed a video during that presentation to the district court, which showed how this can occur, and really, as your honors have pointed out in the deposition testimony of Dr. Hall, he admitted that there's really not a lot of difference between straight stick laparoscopy and the robotic instrument. So dealing then with the comment about abuse of discretion, this court in Allison held that the district court abuses its discretion when under Daubert it applies an incorrect legal standard, and that's what it did in using LeBron and Frazier to decide this case. What should have been applied were the standards that were discussed by Judge Rosenbaum in the JG case, which I covered on my article. The JG case is very different. I mean, there, there was an attack on board a ship, or there was an incident on board a ship, rather, and the person who was in charge of investigating it had 40 years of law enforcement experience, and the plaintiff there did not put forth any reason why that law enforcement experience in conducting investigations would be any different on a cruise ship than it would be on land. There was nothing at all that they put forward with respect to that. So, I mean, that's not what we have here. I don't think it's the same case. It doesn't necessarily mean that I would decide one way or the other in this case, but I just don't find that instructive at all here. Your Honor, if I may offer two points of response. First, the primary reason why we're citing the JG case is for the legal theories which it espouses, which are, one, that in doing a Daubert analysis, the proper thing for the district court to do is look at the credentials of the expert, not at gaps in the expert's knowledge, which is what occurred here. Two, that the threshold for qualifications is not high, and that, three, the experience of the expert doesn't necessarily need to match precisely the matter at issue. Those are the legal issues that I think carry over from JG to this case, regardless of the facts. On the facts, I believe that the case is very similar. In that case, we have an expert who, although qualified in security, maybe lacked credentials in cruise ship security, but was nevertheless qualified to apply. In this case, we have an expert who has 40-plus years in gun and clutch. Right, but the difference, right, is that in JG, there was no reason put forth by Carnival as to why the 40 years of law enforcement experience in conducting investigations would not work the exact same way on a cruise ship as it would off a cruise ship. And here, intuitive has asserted that there is a difference, being that the shaft in the da Vinci device with the 360-degree turn at the tip is in a different position during da Vinci robotic surgery than the shaft on a normal kind of, I guess on a laparoscopic device that would be used, which doesn't have a 360-degree rotating tip. So, I mean, I don't see this case the same way as I see JG Carnival. I just don't think it's the same. I agree with all the principles, the general principles that you're saying, but I don't see how this case is at all the same as JG. Well, Your Honor, let me just mention and speak to those reasons that you are finding distinctions. Number one, again, factually, we would dispute that there is a difference between where the instruments are in a robotic hysterectomy and a laparoscopic hysterectomy. Finally, these types of things that are pointed out as differences don't necessarily go to qualifications. They go to credibility. And as this court found in the Quiet Tech case, when it rejected this exact same type of attack on an expert where there were misunderstandings and confusion on part of the expert on some of the basic principles, the court looked to his credentials and found him qualified. In the McCulloch case from the Second Circuit, these same types of things occurred where the defendants took issue with the defense's lack of knowledge about the chemical composition of the glue at issue and other things, and the court called those quibbles that were more properly brought up of cross-examination. Now, if counsel wants to go through these things and argue that because of those issues, there is no causation, then he's free to make those arguments to a jury after cross-examining our expert, but they go to his credibility, not his qualifications. And that is where we're at, really, which is the trial court only made the determination based on qualification, not on anything else, not reliability, not any of the other prongs, just the first prong. That is correct, Your Honor. And these issues that are identified by intuitive don't go to qualifications. What we look at in qualifications is his credentials and the man is qualified. 40 plus years of experience, 4,000 hysterectomies, board certification, peer review committees. He reviewed the literature. He was trained on the robot. He'd used the robot on a mannequin. There's not much more that you can ask of the man, as Your Honor said, and these gaps of knowledge, even if actually we accept that they exist, which on our side we do not, would only go to the man's credibility and should serve as cross-examination fodder. Counsel, you don't accept that he doesn't, or he testified he didn't know or showed that he didn't know where the scissors would be during the surgery? Your Honor, yes, we don't agree with that, and we cover that in footnote 11 of our reply brief. And I can get into that in detail if you would like, but it's covered in our reply. Thank you. Thank you. All right, counsel, I think we have your argument, and we will take the case under advisement and be in recess. Thank you very much. Thank you, Your Honor. Thank you, everyone.